MILLER *vs.* THE ILLINOIS CENTRAL RAIL ROAD COMPANY,
ROBERT and GEO. L. SCHUYLER and others.

On the 1st of October, 1851, R. & G. L. S. held, by assignment from L., the person named therein, a receipt or certificate in these words: "Office of Illinois Central R. R. Co., New York, May 1, 1851. Received of T. W. L. $7500 advanced to the Illinois Central Rail Road Company, and to be repaid to him or his order, with interest at the rate of six per cent per annum, on demand, or received in payment ten dollars on each share of the capital stock of said company, to be issued to him or his assigns, whenever the directors shall authorize the issue of the second million of the stock, under the provisions of a resolution of the board of directors, passed on the 17th day of April, 1851. M. K., Treas'r Ill. C. R. R. Co." This receipt was assigned to the plaintiff by R. & G. L. S., on the said 1st of October, by an indorsement thereon, "together with the right to take and receive to his own use and account 150 shares of the stock to be issued as set forth in the receipt," the assignors reserving the remainder of the stock for their own use and account. On the same day R. & G. L. S. made and delivered to the plaintiff their promissory note of that date, for $7000, payable in six months, with interest, which recited that the makers had deposited with the payee, with authority to collect, sell or assign the same, the receipt or certificate above mentioned. On the 3d of April, 1852, R. & G. L. S. executed and delivered to the plaintiff another note, of that date, for the same amount and of the same tenor as the first, reciting the delivery of the script for the same purpose, and with the same authority to the plaintiff to collect, sell or assign the same. They at the same time indorsed on the receipt or certificate, the following: "For value received, we hereby assign and transfer to W. S. M. the right to take a further 150 shares of the stock within mentioned, when the same is issued, making in all 300 shares which are to be delivered to him." On the 6th of October, 1852, R. & G. L. S. gave to the plaintiff another note for $7000, payable in ninety days, which recited that they had deposited the said certificate with the plaintiff as "collateral security," with authority to sell the same on the non-performance of said promise. The two latter notes were renewals or extensions of the loan of $7000 made at the date of the first, and at the time of the trial had been paid and were in the possession of the makers. The second million of stock was afterwards issued by the company, and the 750 shares were issued to R. S. on the receipt, and 300 shares were delivered to the plaintiff by him, and the certificate was surrendered to the company. On the 17th of November, 1852, the company resolved to issue 70,722 additional shares, and determined to whom they should be issued, and in what number to each person. No part of the new stock was allotted to the plaintiff, as owner of the 300 shares. If the 70,722 new shares had been distributed to the previous holders of stock in proportion to their shares, there would have fallen to the plaintiff, as holder of the 300 shares, 562 shares of the new. The plaintiff claimed that he was entitled to the 562 new shares as

Miller *v.* Illinois Central Rail Road Company.

an accretion upon the 300 old shares. He had no knowledge of the issue or allotment of the new stock, at the time, nor until after the receipt of his 300 shares, on the 23d of December 1852. R. S. was the president of the company, and controlled all its operations, and the plaintiff alleged that R. & G. L. S. intentionally kept him in ignorance of the allotment, and of his rights, and by that means, and their control over the company, secured to themselves the whole of the new stock allotted to the 300 shares so held by him, and caused the same to be issued to them, and claimed to hold it, which new stock was worth a premium of $35 per share.

*Held,* 1. That the original receipt of the treasurer gave to the person named therein, or the holders, only the right to take the 750 shares at their option, and the holders of that receipt could not, by virtue of it, claim to be holders of the stock mentioned in it, or to have any right thereto, until they had elected and given notice of their intention to take it. That the plaintiff, therefore, until he had done this, had no right to the stock, either as between him and his assignors, or as between him and the company.

2. That the rights of the plaintiff must depend upon the state of things existing at the time the new stock was created and issued; and that, not being at that time, the owner of the 300 shares of stock, and not becoming such owner by electing to take the same, until more than a month afterwards, he had none of the rights of a stockholder, in respect to the new issue of stock.

3. That the ownership of the 300 shares did not necessarily, nor so far as the evidence showed, entitle the holder to the 562 shares of new stock, and a distribution of the same to him.

4. That if, as between the plaintiff and R. & G. L. S. the former had been entitled to the 562 shares of new stock, the company, not having any notice of his rights, were not bound by them.

5. That although certain information came to R. S. the president of the rail road company, casually, while acting as agent of R. & G. L. S., that that firm had contracted conditionally to sell to the plaintiff some stock of the company, if given, without any intimation that it was intended or designed to give notice to him, or the company, or that he, as president, or the company as his principal, should take notice of it or regard it, or the rights or claims of the plaintiff, such information, thus received, did not bind the company as notice.

6. That the surrender of the receipt or certificate, to the company, with the indorsements thereon, made after the new stock was created, and the mode of its distribution resolved upon and carried out by the company, was no notice to the company of the plaintiff's rights. ROOSEVELT, J., dissented.

APPEAL by the defendants, from a judgment rendered at a special term. On the 1st day of October, 1851, the defendants Schuyler, composing the firm of R. & G. L. Schuyler,

held by assignment from T. W. Ludlow, the person therein named, a receipt or certificate, of which the following is a copy:

"Office of .Illinois Central R. R. Co.

New York, May 1, 1851.

Received of Thomas W. Ludlow, seven thousand five hundred dollars, advanced to the Illinois Central Rail Road Company, and to be repaid to him or his order, with interest at the rate of six per cent per annum, on demand, or received in payment ten dollars on each share of the capital stock of said company to be issued to him or his assigns whenever the directors shall authorize the issue of the second million of the stock, under the provisions of a resolution of the board of directors, passed on the 17th day of April, 1851.

(Signed)          MORRIS KETCHUM,

Treas'r Ill. C. R. R. Co."

And on that 1st day of October the defendants Schuyler delivered the said receipt to the plaintiff herein, and executed to him, on the back of it, a transfer or contract of which the following is a copy:

"For value received, we hereby sell, assign and transfer the within receipt to W. S. Miller or his assigns, together with the right to take and receive, to his own use and account, one hundred and fifty shares of the stock to be issued as set forth in the receipt, reserving the remainder of the stock for our own use and account. Witness our hands, the 1st day of October, 1851.          (Signed)          R. & G. L. SCHUYLER."

And on the same day made and delivered to the plaintiff their promissory note of which the following is a copy:

"$7000 and in't.          New York, October 1, 1851.

Six months after date, value received, we promise to pay to Wm. S. Miller, or order, seven thousand dollars (7000) with interest thereon, from this date, at the rate of seven per centum per annum, having deposited with him with authority to collect, sell or assign the same, the receipt of the treasurer of the Illinois Central Rail Road Company, hereto annexed, for seven thousand five hundred dollars and interest thereon, payable on

demand or receivable in payments of ten dollars on each share of the capital stock of said company to be issued to R. & G. L. Schuyler or their assigns, whenever the directors shall authorize the issue of the second million of said stock in pursuance of a resolution of the board of directors on the 17th day of April, 1851. R. & G. L. SCHUYLER,

2 Hanover street."

On the 3d day of April, following, the defendants Schuylers executed and delivered to the plaintiff another note of that date, for the same amount and of the same tenor as the first, reciting in the same terms the delivery of the same scrip for the same purpose, and with the same authority to the plaintiff to collect, sell or assign the same. And at the same time indorsed on the same receipt or certificate then in the hands of the plaintiff an additional indorsement, of which the following is a copy :

' For value received we hereby assign and transfer to W. S. Miller the right to take a further one hundred and fifty shares of the stock within mentioned, when the same is issued, making in all three hundred shares, which are to be delivered to him. New York, April 3d, 1852. R. & G. L. SCHUYLER."

And on the 6th day of October, 1852, the defendants Schuylers gave to the plaintiff another note, of which the following is a copy :

" $7000. New York, October 6, 1852.

Ninety days after date, we promise to pay to W. S. Miller, or order, seven thousand dollars, for value received, with interest at the rate of seven per cent per annum, having deposited with him as *collateral security*, with authority to sell the same at the brokers' board or at public or private sale or otherwise, at his option, on the non-performance of this promise, receipt of Morris Ketchum, Tr. Illinois C. R. R. Co. for $7500, being installment on Illinois C. R. R. stock, in name of T. W. Ludlow, indorsed to R. & G. L. Schuyler.

R. & G. L. SCHUYLER,

2 Hanover street."

The two latter notes were renewals or extensions of the loan of $7000 made at the date of the first, and at the time of the

trial had all been paid and were in the possession of the de-fendants Schuylers. The second million of stock referred to in the certificate or receipt of the treasurer, was afterwards issued by the company, and the 750 shares were issued to Robert Schuyler on the receipt, and 300 shares (either of those mentioned in the receipt, or others in lieu thereof,) were deliv-ered to the plaintiff by Robert Schuyler, and the certificate itself with the indorsements thereon having been delivered to Robert Schuyler, by the plaintiff, was surrendered to the company by him, at the time he obtained the stock thereon from the company. The receipt was delivered to Schuyler on the 20th of December, and the 300 shares of stock were deliv-ered by him to the plaintiff on the 22d of that month. On the 17th day of November, 1852, the company resolved to issue 70,722 additional shares, and also determined by the same reso-lution to whom they should be issued, and in what number to each person. If the 70,722 shares had been distributed to the previous holders of stock in proportion to their shares, there would have fallen to each share of the old stock, one and seven-eighths share of the new, and to the 300 shares transferred by Schuyler to the plaintiff, 562 shares of the new. This resolu-tion to create the new shares and to allot or distribute them, as therein stated, was passed the 17th of November, 1852. No part of the new stock was allotted to the plaintiff as owner of the 300 shares. The stock, old and new, was worth a premium of about 35 per cent at the time, but previous to the time of the commencement of this suit it fell to about 20 per cent above par. The plaintiff had no knowledge of the issue or al-lotment of the new stock, at the time, nor until after the re-ceipt of his 300 shares from Schuyler, on the 23d of December, 1852. He alleged, in his complaint, that Robert Schuyler, by means of the possession of the scrip, so obtained from him, and acting as president of the rail road company, under color of the resolution of November 17, 1852, on or about the said 23d of December, 1852, procured the said 562 additional shares of stock to be issued to him and G. L. Schuyler, in their own names, or to some other person or persons for their benefit,

and that the said R. and G. L. Schuyler claim to hold the same on their own account. The plaintiff claimed that he was entitled to the 562 shares which properly went to the 300 shares as an accretion upon them; that the company had notice of his rights, by the assignment of the receipt to him, indorsed on said scrip; and that Robert Schuyler being throughout these transactions, president of the company, it was bound, by notice through him, of the rights of the plaintiff, and is bound now to give him the shares, on his paying the installments due on them, or to pay him the amount of their value above such installments, or above par.

The judge, at special term, decided and decreed that the plaintiff was entitled, under the assignment to him, to 300 shares of the capital stock of the rail road company described in the pleadings as the 2d million of stock, and was entitled to 562 shares of the new stock, which were on the 23d of December, 1852, issued and delivered by the rail road company to the defendants, the Schuylers, without the consent or knowledge of the plaintiff and with full notice of his rights. And that the plaintiff was entitled to the premium upon such new stock, which, at the time the same was issued to the defendants, the Schuylers, was $35 on each share; amounting in the aggregate, to the sum of $19,670; together with interest. Judgment was therefore given in favor of the plaintiff for $23,173.44, besides costs.

*J. Coit*, for the plaintiff. I. The special endorsement on the scrip set forth in the complaint, and admitted in the answers, was an absolute assignment of 300 shares therein mentioned. (1.) The language is clear that the assignment of the 300 shares was absolute, and not a hypothecation as collateral security for a loan. (2.) The admission on the face of the assignment, that it was for value received, is *prima facie* evidence of a valid consideration, and there is no evidence to disprove it. (1 *Phil. on Ev.* 108.) (3.) The answer admits (fol. 49, 51) that the plaintiff was entitled to receive the 300 shares absolutely. (4.) The *amount* of the consideration, or " value

received is immaterial. The stock in question had no salable value at the time, and if any presumption is to be made, it must be that it was a favor to Schuyler, to divide with him the responsibility which Ludlow refused to assume. (5.) By accepting the assignment, Miller was substituted *pro tanto* to Schuylers' liabilities as .well as rights. (*Ang. & Ames on Corp.* § 534. *Mann* v. *Currie*, 2 *Barb. S. C. R.* 294. *Rensselaer and Washington Plank Road Co.* v. *Wetsel*, 21 *id.* 64.)

II. The transaction was not usurious. (1.) There is no allegation of usury in the answer, nor any proof of it offered. (2.) There is no evidence offered that the transfer of the stock had any connection with the loan to Schuyler on the same day. (3.) The suggestion of usury, made on the argument, not alluded to in the answer, nor supported by affirmative proof, cannot affect the admission that the assignment was for value received. (*Gould* v. *Homer*, 12 *Wend.* 601. *Fay* v. *Grimsteed*, 10 *Barb.* 329. *Catlin* v. *Gunter*, 1 *Duer*, 253. *Archibald* v. *Thomas*, 3 *Cowen*, 284.)

III. The stock in the assignment mentioned was a part of the second issue, (called the second million,) and the assignment by Schuyler carried with it, as a necessary incident, a proportionate interest in the increased value of the stock, whether represented by a premium on the existing stock, or by new stock issued as a bonus to the stockholders. (1.) The "shares of stock" represented an aliquot part of the whole property and franchises of the company; when the shares were 20,000 in number, each share represented 1-20,000th of the whole property; if, then, the shares were doubled in number, two of the new shares repesented the same value as one of the old. (2.) The directors could not appropriate these shares for the partial benefit of some of the stockholders, to the exclusion of others, without manifest injustice. It is accordingly held, in *Angell & Ames on Corporations*, § 554; *Gray* v. *Portland Bank*, (3 *Mass. Rep.* 364;) *Palmer* v. *Lawrence*, (3 *Sand. S. C. R.* 162;) that all the advantages from the creation of the new stock belong equally to the existing shareholders. (3.) The certificates or scrip in question, giving the holder the right

of a certain number of shares when issued, stand in this respect, on the same footing as the shares themselves, and entitle the holder to a like proportion of the increased issue. (*Gray* v. *Portland Bank,* 3 *Mass.* 364.)

IV. It is admitted by the pleadings that Miller had no notice of the resolution of September 17th, for the issuing of the 90,722 shares of stock at the time of the alleged settlement in December, 1853. It is clear, therefore, that between Miller and the Schuylers, Miller was entitled to the 562 shares in question.

V. The Illinois Central Rail Road Company are liable to make good the premium on the value of the stock, at the time the plaintiff was entitled to receive it, which their answer admits to be $35 a share. They had no right to issue the whole additional stock to Schuyler. Their own resolutions showed how much belonged to the Ludlow scrip, and required the shares to be issued to the owners of the scrip. The scrip, when produced to them, showed on the face of it Miller's title to the two-fifths, as clearly as the title of Schuyler to the residue. They are therefore liable in damages for the same amount claimed against the Schuylers. (*Kortright* v. *Buffalo Bank,* 20 *Wend.* 91. *Ang. & Ames on Corporations,* § 554, 565. *Wilson* v. *Little,* 2 *Comst.* 450.)

VI. The objection, that the interest in the certificate was not divisible, cannot be urged to justify a delivery to the wrong person. (1.) The company were under the same liability to divide the shares mentioned in the scrip as in the case of an ordinary certificate of full stock. (2.) The objection, at any rate, is obviated by the assignment in question, inasmuch as the *whole interest* in the scrip is assigned, including option, the right of surrender, &c., with a trust implied to take out 450 shares in the name and for the use of Schuyler.

VII. This assignment to Miller, on the face of the scrip, could only be divested by a re-assignment or a cancelment by Miller, and this the company were bound to see to, at their peril. The indorsement on the certificate of a settlement with William S. Miller, *signed by Schuyler,* was no substitute

for such re-transfer. The document was still evidence that Miller was the party entitled to the stock. The document calling for stock to be issued *to Miller*, the delivery of this document by Miller to an officer of the company, was no authority to issue the stock *to such officer in his own* name.

VIII. The injunction was issued against the company's suffering the specific stock in question, (belonging to the Ludlow scrip) to be transferred, if in possession of the company. It appears by the pleadings, that this stock had been actually issued, and there is no proof to the contrary. There is nothing therefore in the issuing the injunction to prevent the plaintiff receiving the relief prayed—that is, the amount of the premium on the 562 shares, viz. $35 a share.

*Daniel Lord*, for the Illinois Central Rail Road Company. I. The various transfers on the receipt, and the several notes of the same dates, respectively, were cotemporaneous papers, in reference to the same subject, and are to be taken together as forming one agreement. (*Cornell* v. *Todd*, 2 *Denio*, 130. *Palmer* v. *Gurnsey*, 7 *Wend*. 248. *Cooper* v. *Whitney*, 3 *Hill*, 99. *Cowen & Hill's Notes to Phil. Ev.* 958.) And being held to contain the whole agreement, they exhibit the whole consideration. (*Aldridge* v. *Birney*, 7 *Monroe*, 344.) And there being no evidence and no allegation of any other consideration, it was erroneous to construe or imply any other consideration.

II. The transfers and notes together formed a mere mortgage of the receipt. And the concession of the right to take stock, and the transfer of the receipt, were alike redeemable interests; and no absolute title, in respect of either, passed to the plaintiff. (*Coote on Mortgages, ch.* 3, *last Am. ed.* 1 *Powell on Mortgages,* (*Rand's ed.*) 116, *a*. *Palmer* v. *Gurnsey*, 7 *Wend*. 248. *Cooper* v. *Whitney*, 3 *Hill*, 100.) This is an inflexible rule of policy, to protect the mortgaging debtor, and is not one of construction; it prevails even against the direct agreement of the parties. (7 *Wend*. 250.) Evidence of contrary intent was excluded. (*Colvill* v. *Woods*, 3 *Watts*, 188. *Jennings* v. *Ward*, 2 *Vern*. 520.) And it obtains equally

Miller *v.* Illinois Central Rail Road Company.

where an additional bargain or further consideration is connected with the mortgage. (*Willett* v. *Wennell*, 1 *Vern.* 488.) The fact that, on the redemption, Schuyler allowed 300 shares to Miller, without redeeming, does not affect the legal rule applicable to the mortgage. And if Schuyler's acts are to govern, they show only an intent to give the right to take 300 shares.

III. By a true construction of the papers, the plaintiff was not entitled to any other shares than what were issued on the resolve contained in the receipt. By the charter, the increase of stock was to be under the discretion of the board of directors. (*Walker* v. *Devereaux*, 4 *Paige*, 251. *Clarke* v. *Brooklyn Bank*, 1 *Edw. Ch. R.* 362. *Haight* v. *Day*, 1 *John. Ch. Rep.* 20. *Meads* v. *Walker*, 1 *Hopkins*, 590.) No other stock was allotted on the receipt in question, than 750 shares.

IV. The expressions in the transfers of the receipt only gave an option to subscribe to a certain extent. To obtain the benefit of it, a party must give notice, not only of the existence of the privilege, but of his option to exercise it. This never was done by the plaintiff.

V. The company are not chargeable with notice, from the fact that Robert Schuyler, who dealt with the plaintiff, was president of the defendants. In such dealing he was not acting as an officer of the company. It does not appear that, from the office of president, Schuyler had any thing to do with receiving notices of transfers. There is no evidence that any notice of the claim or intent to subscribe for more stock than 300 shares was ever given even to Schuyler. (*Ang. & Ames on Corporations*, ch. 9, § 5. *National Bank* v. *Norton*, 1 *Hill*, 578. *Commercial Bank* v. *Cunningham*, 24 *Pick.* 276. *Fulton Bank* v. *N. Y. and Sharon Canal Co.* 4 *Paige*, 136.)

VI. The receipt itself, when returned to the company, was not notice of any rights in the plaintiff. The face of the paper showed the whole settled between Schuylers and the plaintiff. The possession of the security which had been pledged, with cancellation on it, was presumptive evidence that its obligation had been terminated. (1 *Greenl. Ev.* § 38. 2 *id.* § 527.

*Owen* v. *Barrow,* 4 *Bos. & P.* 101.) The company had no right to suppose the cancellation of the transfer was falsely made, as it would have been a forgery—not to be presumed, in the absence of all evidence. That it would have been a forgery, see 2 *R. S.* 673, § 33, *sub.* 2.

VII. On the evidence in the case, Schuyler is shown to be authorized to receive the full performance of the defendants' contract and to settle it. The complaint alleges him to have been authorized as to the 300 shares, and no limitation of his agency appeared in the papers. The possession of the papers by the mortgagors, and the evidence that they had been mortgaged only, was evidence of Schuyler's right to the receipt and all its advantages. (2 *Greenl. Ev.* § 65. *Story's Agency,* § 104. *Whitlock* v. *Waltham,* 1 *Salk.* 157. *Owen* v. *Barrow,* 4 *Bos. & P.* 101. *Wolstenholme* v. *Davis,* 3 *Eq. Cas. Ab.* 709. *Dutchess of Cleveland* v. *Dashwood, id.* 708. *Anon.* 12 *Mod.* 564, *per Holt.*) The right, under the receipt, was on a contract not divisible without the assent of the company; and supposing Schuylers and the plaintiffs jointly interested in the receipt, the company were right in dealing with the Schuylers and leaving them to fulfill their sub-contract with the plaintiff

VIII. The damages awarded are not warranted by the case. The earliest demand of the stock by the plaintiff, was October 31st, 1853; the value then was $20 per share premium: the rate allowed is $35 per share, the value on 22d December, 1852. And the plaintiff claimed the shares specifically, and enjoined them in the company's hands. They cannot claim damages as upon a wrong issue, and also claim the stock as not issued. It is impossible to ascertain on what basis the judge awarded damages for 562 shares, giving the plaintiff 862 shares on the receipt.

IX. The defendants having proved their defense affirmatively, the judgment should be reversed, with costs, and judgment given for the defendants.

*Alex. Hamilton,* for the defendants R. & G. L. Schuyler.

I. The true construction of the assignment only required the delivery of 300 shares.

II. The answer alleges, and the testimony in the case establishes, that the assignment of the right to the 300 shares was part of the collateral security for the loan of $7000, and that no other consideration but the loan itself ever existed or passed between the parties, in regard to such 300 shares.

III. The loan of $7000 having been repaid in full, with interest at 7 per cent, the bonus or additional compensation of 300 shares delivered to the plaintiff, worth a premium of $10,500, was grossly usurious, but the defendants are content that the plaintiff should retain this large compensation.

IV. The "value received," spoken of in the assignment of the receipt for $7500, was evidently the loan itself, and it was the only and a good consideration in law for the assignment of the receipt as collateral security for the loan.

V. The plaintiff was bound to prove, affirmatively, the "valuable" consideration alleged by him for the transfer of the 300 shares. Any other consideration than the loan was denied by the defendants, R. & G. L. Schuyler.

VI. This is not the case of a party seeking to avoid the payment of a debt on the ground of illegal consideration; but one in which a very large bonus having already been received, contrary to law, a much larger amount is sought to be recovered in the same way. The court cannot close its eyes to the foundation upon which the claim rests.

VII. The instruments relied on by the plaintiff, of Oct. 1st, 1851, and April 3d, 1852, were not transfers of stock, but transfers of the scrip, for $7500, by way of pledge, with an option or privilege to take 150 and 150 shares of the stock. The plaintiff never gave to R. & G. L. Schuyler, notice of his intention to avail himself of this option.

VIII. The injunction having been served upon the defendants on the 21st of November, 1853, and not having been disturbed, the plaintiff can only recover the 562 specific shares of stock, and not the damages for the non-delivery.

IX. At all events, the plaintiff can only recover the differ-ence between $35, the premium of the 23d of December, 1852, and $20, the premium at the time of the service of the injunction.

PEABODY, J. The paper signed by the treasurer of the Illinois Central R. R. Co. was a receipt of the company for $7500. It contained, also, an agreement that it should be repaid to Ludlow or his assigns, on demand, with interest at the rate of six per cent, or that it should be received in payment of $10 on each share of the stock to be issued to him when the directors should authorize the issue of the second million. The language, "to be repaid to him   *   *   *   *   or received in payment ten dollars on each share   *   *   *   * to be issued to him," &c., expresses a contract on the part of the company to do one or the other of those things. As an acknowledgment of the receipt of the money, it is explicit and its meaning unquestionable, and the subsequent part of it contains an agreement either to repay it on demand or accept it as a payment of $10 on a share on account of the stock to be issued. This part is in the alternative, to do one or the other. The paper does not show very clearly which party might elect between the alternatives, but the course of the business shows that it was the intention that Ludlow should elect which course should be taken, and this would probably be the meaning of the paper itself, considered separately from other evidence. The company then had $7500 of the money of Ludlow, which was to be repaid to him on demand, in money or by issuing to him stock of the second million, not then issued, but to be issued to *him* whenever the directors should authorize the issue of that million. They had resolved (April 17, 1851) to issue it, and they agreed to issue to him the number of shares on which this sum would pay $10 per share. $7500 would pay $10 a share on 750 shares. It was then a contract either to repay him the money or issue to him 750 shares of their stock on which this sum, $7500 or $10 a share, was to be credited as paid, and the company was to do the one or the other at the

election of Ludlow or his assigns. It gave Ludlow or his assigns, then, the right, at his or their option, to receive from the company the money or the stock to the amount of it—750 shares. On the 1st of October, following, the Schuylers, being owners of this receipt and contract, indorsed on it, bearing date on that day, an assignment by which they transferred it to the plaintiff. By the transfer indorsed, they "sell, assign and transfer" to him or his assigns the receipt, "together with the right to take and receive to his own use and account 150 shares of the stock to be issued as set forth in the receipt, reserving the remainder of the stock for our (their) own use and account." This transfer is not very clear and intelligible by itself. Being in its terms an absolute sale and transfer of the whole receipt, the part which purports to authorize him to receive to his own use 150 shares, seems to be supererogatory. The paper called the receipt, gave to the holder the right to take the whole 750 shares of the stock, and the assignment of that to the plaintiff gave him apparently the right to take the whole of that amount. To follow the general transfer of that right with the words "together with the right to take to his own use and account 150 shares of the stock," seems unmeaning. But this grant of authority to take to his own use the 150 shares is followed by an express reservation of the rest of the stock (the 750 shares) therein mentioned, to the use of the grantors, in the following words: "reserving the remainder of the stock to our own use and account." This assignment then commences with an absolute transfer to the plaintiff of the right to take the whole 750 shares, and then proceeds in terms indicating an intention to increase his rights, to give him the further right to receive to his own use 150 shares of the stock, and closes with a reservation to the assignors, of the remainder (after deducting the 150 shares,) to their own use. The second part of this paper—that giving the right to take the 150 of the 750 shares—seems utterly unmeaning and ineffectual ; the right to take the whole 750 (including, of course, this 150 with the rest) having been given in the preceding lines ; and the concluding part of the paper containing the reservation of all except the 150

shares, for the use of the assignors, seems absolutely incon-sistent with the first part, which gives the right to take the whole 750 shares. These last provisions seem entirely con-sistent with each other ; but whether taken separately or together, they are both inconsistent with the first. To grant the right to 150 of 750 shares, and reserve the right to the rest of the 750, is consistent and intelligible; but to grant the right to 750 shares, and add to that a grant of 150 out of that 750, is not consistent; and to follow that with an express reservation of all except the 150, though quite consistent with the grant of the smaller number, is contradictory to the grant of the larger number, and cannot consist with it. To construe this paper in such a manner as to give effect to all its parts, is precisely our duty, if it be in our power ; but to do so it is pretty certain, I think, that we must have aid from other evi-dence than that contained in the paper itself. There is evidence in the case, that on the same day on which this assignment was made by the defendants Schuylers, they gave to the plain-tiff their promissory note for $7000, payable in six months, in which it is stated that they had deposited with him, with au-thority to collect, sell or assign the same, the receipt of the Treasurer of the Illinois Central Rail Road Company, for $7500, payable on demand or receivable in payments of ten dollars on each share of the stock of said company, to be issued to R. & G. L. Schuyler, or their assigns, whenever the direct-ors should authorize the issue of the second million of said stock, in pursuance of a resolution of the board of directors, passed April 17, 1851. On the 3d day of April, 1852, this note was taken up and a new note at six months, for the same amount, containing the same statement of the deposit of the re-ceipt of the treasurer as security, was given. This last note, at maturity, was taken up and succeeded by a new one in renewal for ninety days for the same amount, the interest on each of them being paid as they were taken up from time to time. The last note for ninety days also states that the Schuy-lers had deposited with the plaintiff the same receipt of the treasurer of the Illinois Central R. R. Co., and expressly says

Miller *v.* Illinois Central Rail Road Company.

it was so deposited "as collateral security." These notes, then, show the conditions and purpose of the general assignment of the receipt. They show that it was assigned as collateral security for the notes. The same assignment answered for the second and third notes, and no new transfer was made of the receipt, generally, for either of them; but at the same time with the making of the second note a new indorsement was made on the treasurer's receipt, as follows: "For value received, we hereby assign and transfer to W. S. Miller, the right to take a further 150 shares of the stock within mentioned, when the same is issued, making in all 300 shares which are to be delivered to him. Dated April 3, 1852."

In each of these notes, the fact that the plaintiff held the receipt as security is stated. The assignment of the rights of the Schuylers under the receipts was intended merely as collateral security for the payment of the money on the notes, and so far as that was concerned it was redeemable by payment of the money. Nothing is said in the notes about the other provisions in the paper called an assignment—that respecting the 150 shares, or that about reserving to the assignors, the Schuylers, the residue of the 750 shares. As to these parts, the paper must stand, and effect must be given to it, according to it own terms and meaning. Nothing in the case goes to modify these terms.

After the giving of the last note, and before it fell due, the company, by a resolution bearing date on the 17th day of November, 1852, created and distributed 70,722 new shares of the stock. This stock, the plaintiff says, was distributed among the stockholders as an increase or addition to the stock held by them, including the scrip, and in the proportion of one share and seven-eighths of the new stock for each share of the old; and he claims that he was entitled, as holder of the 300 shares, to 562 shares of this new stock as an accumulation of, and an addition to, his 300 shares.

To this claim several objections are interposed by the defendants: 1st. That the plaintiff, at the time of the creation of the new stock, was not the holder of the 300 shares; that he

merely had the right to elect to take them, but had not elected. 2d. That if he was owner of the 300 shares, he had no right, as such owner, to a distributive share in the new stock. And by the company it was insisted, 3d. That all his rights were matters between himself and the Schuylers, of which the company had no legal notice, and which they were not bound to regard.

As to the first objection, there is nothing in the case to show that the plaintiff, on the 17th day of November, 1852, had determined to take the 300 shares which the defendants Schuylers had given him the right to take. They gave him the right to take 150 shares, by an indorsement on the receipt, bearing date the 1st day of October, 1851, and the right to take 150 shares more, making 300 in all, by another indorsement thereon, bearing date the 3d day of April, 1852. These indorsements were in form assignments to the plaintiff of the right to take this number of shares of the stock. The original receipt of the treasurer gave the Schuylers, or the holder, only the right to take the 750 shares therein mentioned, at·their option, and the holders of that could not, by virtue of it, claim to be holders of the stock mentioned therein, or to have any rights to it until they had elected and given notice of their intention to take it. The plaintiff, therefore, until he had done this, had no right to this stock, either as between him and the Schuylers, or as between him and the company.

The receipt gave the holder of it only this right as against the company; and the Schuylers merely gave the plaintiff the same rights they had as to 150 of the shares therein provided for. The plaintiff does not aver in his complaint, or prove, that he had made his election, to take the shares or not, much less does he aver or prove that he had given notice of his election, either to the company or to the Schuylers, and he had no right as against either of them, to the stock, until he had both elected and given notice of his election. If he had exercised his right of election, and had notified the Schuylers, he would then have had a right to the stock, out of their 750 shares. If the company had been properly notified by him of his rights and of his

election to take, and that he should look to them to issue it to him, they would probably have been bound by that notice, and he would, as to both of them, probably have been entitled to the stock, and would thereby have acquired the rights of a stockholder as to any new issue of stock. The only averment of an election by him, in his complaint, occurs at fol. 17, and he there only avers that on the 20th day of December, 1852, he gave to Robert Schuyler the receipt of the treasurer, to enable him to receive for him (the plaintiff) such stock as the plaintiff might be entitled to from the company, and that said Schuyler did deliver to him the 300 shares, on the 23d of that month. There is no claim or evidence of an election or notice by the plaintiff until this time. This, I suppose, may be considered an election, and notice of it to the Schuylers, at least; and from this time forth, as between the plaintiff and the Schuylers, he was entitled to, and had, the rights of owner of this stock. But the 70,722 shares had been created, and partially or wholly distributed before this time. The rights of the plaintiff must depend on the condition of things at the time the stock, of which he claims a distributive share, was created and issued. At that time he was not owner of this 300 shares or any part of it. More than a month after that he became, by his own account, the owner of it, to be sure; but he could not retroactively acquire any right to it, and he did not. The title to it had already vested in some one else, perhaps, and whether it had or not, he had no right to it. His purchase of the 300 shares was made, in effect, in December following—more than a month thereafter.

The second point is, that even if he were holder of the 300 shares, he was not entitled for that reason to the distributive share of the new stock. The ownership of stock of the company gave to the owner an undivided interest as owner, in the property of the corporation—an interest which bore the same proportion to the whole property, as his shares did to the whole number of shares. This right was a right or proportionate interest in the assets of the company, and in the proceeds and benefits of the property of the company. These assets

were the property of the corporation. This was a right not to any part of the assets, separately and exclusively—not a right to an immediate, exclusive possession of, or property in, any particular part of those assets; not a right to an immediate distributive share of the assets or any part of them—and no more a right to a distributive share of any stock of the corporation belonging to itself, than to any other property belonging to it. Prima facie all the property of the corporation was dedicated to its use for the purpose of advancing the enterprise for which it was organized ; and any stock it might own, whether of its own capital or that of any other company, like any other property, was to be used in the discretion of its officers to accomplish that end in the manner most beneficial to the corporation, and corporators as such. As to the 70,722 shares of stock they resolved to create, that, as soon as created, belonged to the company, and like other property was to be used for its benefit and advancement in the business to which its energies were to be applied. In the hands of its directors and agents the $35 per share which that was worth was properly applicable, like its other funds and means, immediately to the advancement of the interests of the corporation, and in this manner to the benefit of its corporators or stockholders. To divide this at once among the stockholders, in proportion to their interests respectively, would have been to withdraw from the treasury of the company the sum which it was worth, and diminish to that extent its means ; a measure which might or might not be for the best interests of the company, and its members, and which as it might or might not seem so to its directors and agents, it became their duty to adopt or reject, but it was one which at any rate neither the plaintiff nor any stockholder could demand as his right. It is not shown that such a distribution was made among the stockholders generally, and I think there is some evidence that it was not, but in the absence of evidence on the subject, the view most favorable to the plaintiff, we cannot assume that it was, but are bound to suppose that this fund was administered like other assets of the company in the manner deemed on the whole most bene-

ficial. Whatever disposition was made of it, the stockholders get the benefit of it directly or indirectly.

The only question remaining to be examined, is that of notice; and this relates only to the liability of the company. The plaintiff says that it had notice. 1st. Through Robert Schuyler, with whom as a member of the firm of R. & G. L. Schuyler, the plaintiff dealt as to the stock. 2d. That it had notice by the production to it of the treasurer's receipt with the indorsement thereon, at the time the stock was issued upon it and it was surendered.

The notice claimed through Robert Schuyler is claimed on the ground that he being president of the company, it is bound by any information he had. But it must be borne in mind that he had no intercourse on this subject with the plaintiff as president of the company. The plaintiff had no intercourse with the company on this subject, either through Schuyler or otherwise. He had no dealing with Robert Schuyler, for himself, even. He dealt with the firm of R. & G. L. Schuyler, and his dealings with this firm were through the medium of Robert, who, as a member of that firm, had the power of an agent to bind it by his acts, in its name and on its behalf. But notice to R. & G. L. Schuyler, was not notice to the company. Neither is notice to Robert notice to the company, in a matter in which he represents, not the company, but R. & G. L. Schuyler. In this matter, Robert did not represent the company at any time. Notice to an agent, in a transaction for which he is employed, is notice to his principal, and it is *only* in such a case that the principal (whether a corporation or a natural person) is bound by notice to his agent. No notice, as such, was in point of fact given to him in any character, as president or agent of the company or otherwise. Certain information, it is true, came to him casually, while acting as agent of R. & G. L. Schuyler, that that firm had contracted conditionally to sell to the plaintiff some stock of this company, without an intimation, however, that it was intended or designed to give notice to him, or the company, or that he as president, or the company as his prin-

cipal, should take notice of it or regard it, or the rights or claims of the plaintiff in relation to the subject of it. Such information, thus received, (if notice it can be called at all) does not bind the company as notice. (*Ang. & Ames on Corp.* §§ 305, 306, 307, 308. *National Bank* v. *Norton,* 1 *Hill,* 578. *Fulton Bank* v. *N. Y. and Sharon Canal Co.* 4 *Paige,* 136.)

The surrender of the certificate or receipt with the indorsements thereon, has still less the semblance of a notice. In the first place, the surrender was made after the 20th of December, and long after the new stock was created and the mode of its distribution resolved on and formally acted on by the company with certain parties, on terms which gave the transaction the nature of a contract between the company and the parties contracting to take. And in the second place, the paper was in possession of Robert when they first saw it, and it was surrendered by him as a member of the firm of R. & G. L. Schuyler, in whose hands the receipt, even with the indorsements thereon, was presumptively the property of the firm which he represented, and not of the plaintiff. Such a paper with the assignment indorsed, in the hands of the assignor, prima facie belongs to him and not to the person named as assignee in the assignment, thus apparently not completely executed by a delivery, or else surrendered to the assignor and in his power for the purpose of cancellation or other disposition.

The surrender by him to the company, was in itself a representation by him that he had the authority to surrender, and his mere possession of the assignment accompanied with this representation and act, was far from being evidence to the company that he did not own the certificate, or had parted with his right to it; so that, 1st. If, as between the Schuylers and the plaintiff, he had been entitled to the 562 shares, the company had no notice of his rights, and were not bound by them; and 2d. As between him and the Schuylers he was not at the time the new stock was created and his right to it is said to have accrued, the owner of the 300 shares upon the strength of his title to which he bases his claim; and 3d. The ownership of

these 300 shares did not necessarily, nor as far as the evidence shows, entitle the holder to the 562 shares and a distribution or delivery of them to him, whoever he may have been.

A new trial must be granted; costs to abide the event.

MITCHELL. P. J., concurred.

ROOSEVELT, J., dissented.

New trial granted.

[NEW YORK GENERAL TERM, June 6, 1857. *Mitchell, Roosevelt* and *Peabody*, Justices.]